UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| MELISSA M. FETTINGER, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | CAUSE NO. 1:11-CV-00291 |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Melissa Fettinger appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").[1] (*See* Docket # 1.) For the following reasons, the Commissioner's decision will be REVERSED, and the case will be REMANDED for further proceedings in accordance with this Opinion.

## I. PROCEDURAL HISTORY

Fettinger applied for DIB and SSI in February 2007 alleging disability as of November 30, 2004. (Tr. 119-24.) Her date last-insured for DIB was September 30, 2006 (Tr. 127), and thus with respect her DIB claim, she must show she was disabled by that date. *See Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997). The Commissioner denied her application initially and upon reconsideration, and Fettinger requested an administrative hearing. (Tr. 66-73, 77-82,

---

[1] All parties have consented to the Magistrate Judge. (Docket # 9); *see* 28 U.S.C. § 636(c).

89, 96.) On December 11, 2009, a hearing was conducted by Administrative Law Judge ("ALJ") John Pope, presiding from Chicago via video, at which Fettinger (who was represented by counsel) and her mother appeared in person in Fort Wayne, Indiana, and a vocational expert appeared telephonically. (Tr. 27-61.) On March 18, 2010, the ALJ rendered an unfavorable decision to Fettinger, concluding that she was not disabled because she could perform a significant number of unskilled, light work jobs in the economy. (Tr. 11-21.) The Appeals Council denied her request for review, at which point the ALJ's decision became the final decision of the Commissioner. (Tr. 1-5, 196-99.)

Fettinger filed a complaint with this Court on August 25, 2011, seeking relief from the Commissioner's final decision. (Docket # 1.) In her appeal, Fettinger alleges that the ALJ erred: (1) by discrediting her symptom testimony and disregarding the testimony of her mother; (2) when posing hypotheticals to the VE at step five; and (3) by failing to consider the records of her treating pain management specialist, Dr. Hedrick. (Pl.'s Br. 3-7.)

## II. FACTUAL BACKGROUND[2]

### *A. Background*

At the time of the ALJ's decision, Fettinger was twenty-six years old; had obtained her high school equivalency degree (GED); and possessed work experience as a housekeeper and material handler. (Tr. 119, 135, 147, 152.) Fettinger alleged in her application that she became disabled due to fibromyalgia and degenerative disk disease. (Tr. 146.) Because Fettinger does not challenge the ALJ's consideration of her psychological impairments, the Court will focus primarily on the evidence pertaining to her physical limitations.

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 651-page administrative record necessary to the decision.

### B. Fettinger's Testimony at the Hearing

At the December 2009 hearing, Fettinger, who was 5'7" tall and weighed 142 pounds, testified that she was single and that she and her four-year-old son lived with her parents in their two-story home. (Tr. 32.) She stated that she had last worked for two months in 2006 as a housekeeper and "sitter" at a nursing home. (Tr. 33.)

On a typical day, Fettinger testified that due to her pain she spends most of her waking hours shifting between lying on one side or the other and then sitting in a chair for a brief period of time; she cannot lie on her back or stomach. (Tr. 38, 52-53.) From these positions, she watches television, reads, or entertains her son. (Tr. 38, 52-53.) Her mother prepares her meals and does all of the housework and shopping; Fettinger said if her mother was not available, she could prepare a simple meal in the microwave but could not perform other household chores. (Tr. 39-41.) Fettinger is, for the most part, independent with her self care skills, but her mother occasionally helps her to get in and out of the shower and when donning pants, shoes, and socks. (Tr. 40, 56.) She drives a car, but only if she "really ha[s] to." (Tr. 47-48.)

Fettinger testified that her pain is "constant"; feels "sharp, like an electric shock"; and is centered in her low back and hips, extending into her buttocks and legs. (Tr. 44.) She also has "burning pain" in her shoulders and arms much of the time. (Tr. 44-45.) Her pain worsens with activity. (Tr. 45.) Fettinger stated that she takes medication (MS Contin, Percocet, Trazodone, Flexeril, Diamox, and a potassium supplement) and receives steroid injections once a month for her back pain, which help reduce, but not eliminate, her pain. (Tr. 35-37, 45, 49-50.) When asked how her pain at the hearing compared to her pain in November 2004, her alleged onset date, Fettinger replied that it is "exactly the same if not getting worse" (Tr. 50); she described

3

her current pain as a "ten" on a ten-point scale (Tr. 54).

As to her physical capacity, Fettinger reported that the most she can lift is one-half of a gallon of milk. (Tr. 45-46.) She claimed that in an eight-hour workday she could walk for "[j]ust a few minutes," stand for four minutes, and sit for "way less" than fifteen minutes total. (Tr. 46-47.) She stated that she has to change positions "every minute or two" due to her pain (Tr. 53); the hearing transcript reflects that in the fifty-five minute hearing Fettinger asked the ALJ two times if she could stand (Tr. 34, 54). She also complained of having difficulties with concentration. (Tr. 41, 43.)

### C. *Summary of the Testimony of Fettinger's Mother*

Fettinger's mother, Kelly, also testified at the hearing. (Tr. 54-58.) She described her daughter's pain as "excruciating," stating that all day she lies "either on one side or the other" and that she is "up and down constantly every couple minutes." (Tr. 55.) Kelly stated that she prepares all the meals for her daughter, does the housework, helps care for Fettinger's son, and takes them to doctor appointments; more succinctly, Kelly reported that Fettinger does not do anything around the house. (Tr. 56-57 ("We do all, you know, anything she needs we do for her.").)

### D. *Summary of the Relevant Medical Evidence Before the ALJ*

At the age of thirteen, Fettinger was in a motor vehicle accident, injuring her back, as well as her jaw; she suffered from back pain thereafter. (Tr. 259.) Prior to 2005, Fettinger was treated at Fort Wayne Orthopaedics for her back pain, receiving epidural blocks, physical therapy, and pain medications. (Tr. 259.) Her back pain worsened during her pregnancy in 2005, and she was placed on bed rest. (Tr. 259.)

In March 2006, an MRI of Fettinger's back showed small, focal disk protrusions at the L3-4 and L4-5 levels with mild encroachment on the thecal sac and a large protrusion at L5-S1 with encroachment. (Tr. 259-60.) A June 2006 x-ray of her neck was normal. (Tr. 259.)

In July 2006, Fettinger visited Dr. Anil Rao for her back, hip, and leg pain, complaining that she could hardly walk. (Tr. 259-66.) Dr. Rao observed that Fettinger had tenderness at three trigger points consistent with a fibromyalgia-like syndrome and reduced range of motion in her back, but otherwise normal range of motion and a normal neurological exam. (Tr. 260.) He opined that Fettinger's pain complaints were out of proportion with her MRI findings and that she had not responded well to epidural blocks or conservative therapy. (Tr. 260.) He diagnosed her with lumbar degenerative disk disease, but found no evidence of inflammatory arthritis. (Tr. 260.) One month later, Dr. Rao reported that Fettinger's x-rays and labs were normal. (Tr. 268.) He diagnosed her with lumbar degenerative disk disease with sciatica, for which he prescribed Lodine, and fibromyalgia syndrome, for which he recommended low-impact exercise. (Tr. 268.)

In September 2006, Fettinger went to the emergency room due to a panic attack. (Tr. 279-80.) Upon examination, Fettinger complained of pain to touch in her legs, but otherwise exhibited normal range of motion and a normal neurological exam. (Tr. 279-80.) She was diagnosed with acute anxiety, depression, and chronic back pain. (Tr. 280.)

An October 2006 discogram showed degenerative disk disease and radiculopathy at L3-4 through L5-S1 levels of Fettinger's spine. (Tr. 275-76.) A CT scan showed an annular tear at the L3-4 level and annular tears associated with broad disk protrusions at the L4-5 and L5-S1 levels. (Tr. 277.) Dr. Loi Phuong, a neurosurgeon, noted the discogram results and discussed treatment options with Fettinger. (Tr. 300-01.) He thought that both the lumbar degenerative disk disease

5

and her fibromyalgia were contributing to her chronic low back pain. (Tr. 300.) He recommended that she continue conservative treatment and referred her to Dr. David Lutz, a specialist in physical medicine and rehabilitation. (Tr. 300-01.)

In December 2006, Dr. Lutz evaluated Fettinger. (Tr. 297-99.) He reviewed her history of long-standing back pain and the variety of conservative treatment she received between 1999 and 2005, including epidurals, intradiscal electrothermal therapy, physical therapy, and numerous medications, such as long-acting narcotics. (Tr. 297-99.) A motor exam revealed intact power throughout the lower extremities and no evidence of atrophy, but a sensory exam showed reduced light touch and pinprick sensation in the left lower extremity. (Tr. 298.) Straight-leg raises increased low back symptoms, and there was lumbar tenderness to palpation. (Tr. 298.) Lumbar forward flexion was poor, and difficulty with return to upright was noted. (Tr. 298.) His impression was chronic intractable low back pain and bilateral leg pain, an L3-4, L4-5, and L5-S1 positive discogram, and a history of fibromyalgia. (Tr. 298.) He noted that the injections and IDET were not particularly helpful in the past and thus recommended she try aquatic therapy and perhaps a spinal cord stimulator; he also instructed her to continue the narcotic pain medications. (Tr. 298-99.)

In April 2007, Dr. Michael Holton performed a consultative exam. (Tr. 435-38.) Fettinger reported to Dr. Holton that she could sit up to twenty minutes without changing position, stand for ten minutes, and walk one block without significant difficulty or increase in pain. (Tr. 435.) Dr. Holton observed that Fettinger had increased low back pain when heel walking, palpable tenderness in her low back, and some loss of light touch in her L5-S1 area; however, she exhibited normal gait, muscle strength, reflexes, finger manipulation, and grip

6

strength, and had a negative straight leg-raising test. (Tr. 437.) He diagnosed her with chronic low back pain with a reported history of degenerative disk disease after a 1998 car accident, and a more recent onset of neck pain with occasional numbness. (Tr. 437.)

In May 2007, Dr. F. Lavallo, a state agency physician, reviewed Fettinger's record and opined that she could lift up to twenty-five pounds frequently and fifty pounds occasionally; stand or walk for six hours in an eight-hour workday; sit for six hours in an eight-hour workday; perform unlimited pushing and pulling; and occasionally climb, balance, stoop, kneel, crouch, and crawl. (Tr. 439-46.) In reaching this conclusion, he cited Fettinger's March 2006 lumbar MRI results and Dr. Lutz's and Dr. Holton's findings in December 2006 and April 2007, respectively. (Tr. 440-41.) Dr. Lavallo's opinion was later affirmed by a second state agency physician. (Tr. 545.)

From March 2007 to November 2009, Dr. William Hedrick of the Centers for Pain Relief treated Fettinger for pain management of her fibromyalgia, sacroiliitis, chronic back pain, lumbar radiculopathy, and lumbar facet arthropathy. (Tr. 557-651.) He prescribed medications, including Percocet and MS Contin, and multiple steroid injections to Fettinger's back. (Tr. 557-651.) Throughout 2007 and 2008, Dr. Hedrick regularly noted that Fettinger had tenderness in her low back and a positive Patrick's test, but normal neurological exams and normal heel/toe walking and gait. (Tr. 557-651.) Fettinger also regularly reported that her medications and shifting positions helped to reduce her pain, but that postural movements aggravate it; she often reported her pain between a "five" and a "seven" on a ten-point scale, but stated that it increases up to a "ten" at times and that it causes her difficulty with sleeping. (Tr. 557-651.)

In June 2009, Fettinger told Dr. Hedrick that for the most part her pain was tolerable on

the current medication regime. (Tr. 577.) Two months later, however, Fettinger visited the emergency room due to increased back pain. (Tr. 573.) In October, Dr. Hedrick discussed the possible use of a spinal cord stimulator if Fettinger's pain did not lessen through radio-frequency ablation. (Tr. 563.) In November 2009, Dr. Hedrick administered the radio-frequency ablation procedure, after which Fettinger reported some decrease in her pain and increase in the effectiveness of her medications. (Tr. 557-62.)

### III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

8

## IV. ANALYSIS

### A. *The Law*

Under the Act, a claimant is entitled to DIB or SSI if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[3] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. §§ 404.1520, 416.920. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it

---

[3] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

9

shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

## B. *The ALJ's Decision*

On March 18, 2010, the ALJ issued the decision that ultimately became the Commissioner's final decision. (Tr. 11-21.) He found at step one of the five-step analysis that although Fettinger had worked after her alleged onset date, her work activity did not rise to the level of substantial gainful activity. (Tr. 13.) At step two, the ALJ concluded that Fettinger's fibromyalgia, degenerative disk disease, and sacroiliitis were severe impairments. (Tr. 13.) At step three, the ALJ determined that Fettinger's impairment or combination of impairments were not severe enough to meet a listing. (Tr. 16.)

Before proceeding to step four, the ALJ determined that Fettinger's symptom testimony was not reliable to the extent it portrayed limitations in excess of the following RFC:

> [T]he claimant has the residual functional capacity to perform light work . . . except the claimant can only occasionally climb, balance, stoop, kneel, crouch and crawl.

(Tr. 16.)

Based on this RFC and the VE's testimony, the ALJ concluded at step four that Fettinger was unable to perform any of her past relevant work. (Tr. 19.) The ALJ then concluded at step five that she could perform a significant number of light, unskilled jobs within the economy, including general office clerk, receptionist, hand packer, and cashier. (Tr. 20.) Accordingly, Fettinger's claims for DIB and SSI were denied. (Tr. 20-21.)

## C. *The ALJ's Credibility Determination Will Be Remanded*

Fettinger contends, among other things, that the ALJ improperly discounted the credibility of her symptom testimony. Because his reasoning with respect to Fettinger's

credibility determination is, in part, difficult to trace and "patently wrong," the ALJ's credibility determination will be remanded.

Credibility determinations are the second step in a two-step process prescribed by the regulations for evaluating a claimant's request for disability benefits based on pain or other symptoms. *Williams v. Astrue*, No. 1:08-cv-1353, 2010 WL 2673867, at *9-10 (S.D. Ind. June 29, 2010); *Behymer v. Apfel*, 45 F. Supp. 2d 654, 662 (N.D. Ind. 1999); 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p. First, the ALJ must determine whether there is an underlying medically determinable physical or mental impairment—that is, an impairment that can be shown by medically acceptable clinical and laboratory diagnostic techniques—that could reasonably be expected to produce the claimant's pain or other symptoms. *Krontz v. Astrue*, No. 1:07-cv-00303, 2008 WL 5062803, at *5 (N.D. Ind. Nov. 24, 2008); *Williams v. Chater*, 915 F. Supp. 954, 964 (N.D. Ind. 1996); 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p. If the record does not allow the ALJ to make such a finding, then that ends the inquiry, for a finding of disability cannot be made solely on the basis of the claimant's symptoms, even if they appear genuine. SSR 96-7p.

If, however, the medical evidence shows the existence of an underlying impairment that could be reasonably expected to produce the claimant's symptoms, the ALJ must evaluate "the intensity, persistence, and functionally limiting effects of the symptoms . . . to determine the extent to which the symptoms affect the individual's ability to do basic work activities." SSR 96-7p; *see Herron v. Shalala*, 19 F.3d 329, 334 (7th Cir. 1994); *Bellmore v. Astrue*, No. 4:08-cv-94, 2010 WL 1266494, at *10 (N.D. Ind. Mar. 25, 2010); *Walker v. Astrue*, No. 4:09-cv-44, 2010 WL 1257441, at *5 (S.D. Ind. Mar. 25, 2010); 20 C.F.R. §§ 404.1529(c), 416.929(c). "This

requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects." SSR 96-7p.

Because the ALJ is in the best position to evaluate the credibility of a witness, his determination is entitled to special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and he articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *see Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo*, 458 F.3d at 584, his determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness . . . .").

Here, the ALJ found that Fettinger had an underlying medically determinable physical impairment that could reasonably be expected to produce her alleged symptoms. (Tr. 18). Accordingly, the ALJ proceeded to step two to evaluate the functionally limiting effects of Fettinger's alleged symptoms to determine the extent to which they would affect her ability to do basic work activities. *See Herron*, 19 F.3d at 334; 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p. There, the ALJ concluded that Fettinger's statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible to the extent they were inconsistent with the RFC that he had assigned. (Tr. 18.)

In discounting Fettinger's credibility, the ALJ first honed in on her activities of daily living, stating:

> The claimant testified in her hearing that most of her days were spent lying down, shifting her weight from side to side to alleviate her chronic pain. However, the claimant stated that she does most bathing, grooming and dressing tasks on her own. She also testified that she has developed a routine of reading her Bible on Sundays, in lieu of attending formal church services. She has maintained a consistent stream of medical appointments, to which she sometimes drives. The claimant also stated that she reads to and plays games with her son. She also admitted that if her mother did not perform all the household chores for her, she could do some of those tasks herself. These activities are not consistent with the claimant's testimony that during an eight hour day, she would be able to walk for a few minutes; stand for four minutes; and sit for less than 15 minutes.

(Tr. 18.) The ALJ's reasoning here fails to build an accurate and logical bridge from the evidence of record to his credibility determination, as the daily living activities that Fettinger performed were no more than minimal in nature. *See Carradine*, 360 F.3d at 755 (remanding an ALJ's credibility determination when the ALJ failed "to consider the difference between engaging in sporadic physical activities and [the claimant's] being able to work eight hours a day five consecutive days a week"); *DeCoito v. Astrue*, No. 1:07-cv-0330-SEB-TAB, 2008 WL 906164, at * 6-8 (S.D. Ind. Mar. 31, 2008) (same); *see also Mendez v. Barnhart*, 439 F.3d 360, 362-63 (7th Cir. 2006) (cautioning ALJs "against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home"); *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005) (same).

Specifically, the fact that Fettering does most of her bathing, grooming, and dressing without assistance does not mean that she performs these tasks without significant pain, and thus her independence in this area does not necessarily conflict with her testimony that she spends most of her days lying on her side to alleviate the pain. And, of course, the ALJ's observation that Fettinger reads the Bible in lieu of attending church is simply illogical, as that if anything *increases* the credibility of her complaints, suggesting that she has too much pain to actually

13

attend church.

Likewise, the ALJ's discrediting of Fettinger's complaints on the basis that she reads and plays with her son is difficult to trace, as Fettinger explained that she interacts with her son while she is reclined on the couch and that her parents take her son to the park and to his appointments. (Tr. 49, 52 ("If he comes over like to the couch and sits up by me I can read books to him, like that. I can play some short games with him, as long as he's up on the couch beside me.").) Similarly, the ALJ's discounting Fettinger's complaints based on her "consistent stream of medical appointments" is hard to follow, as Fettinger testified that she was "extremely overdoing it" by attending the hearing and that she only drives if she "really ha[s] to." (Tr. 46-47.)

Moreover, the ALJ was "patently wrong" when he articulated, no less than twice, that Fettinger said that she could perform the household chores if her mother was unavailable. (*See* Tr. 15, 17); *Powers*, 207 F.3d at 435. Fettinger, in fact, testified to *just the opposite—*that she could *not* perform any household chores other than heating up food in the microwave. (Tr. 40-41.) Therefore, the ALJ has failed to build an accurate and logical bridge from Fettinger's daily activities to his discrediting of her pain complaints. *See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002).

The ALJ also said he discounted Fettinger's credibility because her treating medical sources did not reference the "debilitating pain or the severely limited activities that [she] described at the hearing." (Tr. 18.) The ALJ then cited her September 2006 visit to the emergency room for a panic attack as an example, emphasizing that she "failed to mention back, neck or hip pain" at the visit. (Tr. 18.) But the ALJ cherry-picked the evidence in this respect, as Fettinger *did* regularly mention the severity of her pain to her providers.

14

For example, Dr. Rao's July 2006 evaluation reflects: "[Fettinger] has severe back pain with radiation of pain to both hips and thighs. The pain is there every day, constant. Lifting and bending movements make her back pain worse. She has been hardly able to walk." (Tr. 259.) And Dr. Phuong's December 2006 evaluation states: "She indicates that her pain is sharp and stabbing nature and ranges from 8-9:10. Bending, lifting, walking, and lying on her back for prolonged periods exacerbate her pain. She could identify no activity that decreased the pain." (Tr. 297.) And to Dr. Hedrick in 2007 to 2009, Fettinger routinely reported pain ratings from "five" to "seven," emphasizing that at times it increased to a "nine" or "ten." (*See* Tr. 557-651.) Of course, "[a]n ALJ may not selectively discuss portions of a physician's report that support a finding of non-disability while ignoring other portions that suggest disability." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010).

The ALJ also discredited Fettinger's testimony that she could sit less than fifteen minutes during an eight-hour workday on the basis that she "sat for considerably longer than 15 minutes during her hearing, which lasted approximately 55 minutes." (Tr. 18.) Fettinger claims that this reason, too, is "patently wrong" because although she only asked the ALJ for permission to stand two times, she actually shifted from sitting to standing much more than that during the hearing. (Pl.'s Br. 4; *see* Tr. 34, 54.) She attributes the ALJ's oversight to the fact that he conducted the hearing via video, rather than in person. (Pl.'s Br. 4.)

Admittedly, the ALJ provided at least two other reasons to discredit Fettinger that have more traction. First, the ALJ pointed out that Dr. Holton indicated in April 2007 that Fettinger said she could sit for fifteen to twenty minutes without changing position, stand for about ten minutes, and walk a full block without significant increase in discomfort, which is less restrictive

15

than Fettinger's description of her limitations at the hearing. (Tr. 18.) Of course, "[o]ne strong indication of the credibility of an individual's statements is their consistency . . . ," SSR 96-7p; *see Kornfield v. Apfel*, No. 00C 5642, 2003 WL 103009, at *4 (N.D. Ill. Jan. 9, 2003) (discounting a claimant's credibility due to her inconsistent statements), and in this respect, Fettinger's statements were not particularly consistent.

The ALJ also relied upon Dr. Rao's observation in July 2006 that Fettinger's "pain symptoms [were] out of proportion to the MRI findings." (Tr. 260.) Indeed, an ALJ "may properly discount portions of a claimant's testimony based on discrepancies between [the c]laimant's allegations and objective medical evidence." *Crawford v. Astrue*, 633 F. Supp. 2d 618, 633 (N.D. Ill. 2009).

Yet, the Court has some concern about the ALJ's reliance on Dr. Rao's observation, as Dr. Rao *further* noted that his examination "showed multiple myofascial trigger points consistent with fibromyalgia-like syndrome." (Tr. 260.) In that regard, courts have observed:

> Fibromyalgia is a mysterious disease; doctors know very little about what causes it or how to treat it. There are no objective medical tests that can confirm the existence of fibromyalgia. Rather, the principal symptoms, which include persistent pain, fatigue, disrupted sleep, stiffness, and numerous tenders spots on the body, are all subjective.

*Allen v. Massanari*, No. 01 C 1045, 2002 WL 398510, at *9 (N.D. Ill. Mar. 14, 2002) (citing *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996)). Accordingly, "subjective complaints in [a fibromyalgia] case are more important than in other cases because they are clinical indicators of the disease of fibromyalgia." *Kurth v. Astrue*, 568 F. Supp. 2d 1020, 1032-33 (W.D. Wis. 2008); *Gister v. Massanari*, 189 F. Supp. 2d 930, 936-37 (E.D. Wis. 2001) (remanding credibility determination where the ALJ's discussion of the SSR 96-7p factors was flawed with respect to a

claimant asserting disability based on fibromyalgia); *Aidinovski v. Apfel*, 27 F. Supp. 2d 1097, 1103 (N.D. Ill. 1998) (remanding credibility determination where there was no indication that the ALJ considered "the particularly subjective nature of fibromyalgia symptoms and their role in assessing [the claimant's] credibility").[4] Thus, this reason does not particularly assuage the Court's concern about the gaps in the ALJ's credibility determination.

In any event, at least three of the underpinnings of the ALJ's credibility analysis are difficult to trace or "patently wrong." *Powers*, 207 F.3d at 435. "When the decision of [the ALJ] on matters of fact is unreliable because of serious mistakes or omissions, the reviewing court must reverse unless satisfied that no reasonable trier of fact could have come to a different conclusion . . . ." *Sarchet*, 78 F.3d at 309. Here, the Court believes that a reasonable trier of fact could indeed come to a different conclusion—that is, that Fettinger's complaints are credible to the extent that her limitations preclude her from performing the requirements of the RFC for light work assigned by the ALJ. Accordingly, the case will be remanded so that the ALJ may reassess the credibility of Fettinger's complaints of debilitating pain in accordance with Social Security Ruling 96-7p and build an accurate and logical bridge between the evidence of record and his conclusion.[5]

---

[4] Of course, "it is not enough for a claimant to have fibromyalgia—one must demonstrate that the disease's symptoms are disabling . . . ." *Culver v. Astrue*, No. 07-C-643, 2008 WL 4103875, at *2 (E.D. Wis. Aug. 29, 2008) (affirming credibility determination of a claimant claiming disability due to fibromyalgia where the ALJ discounted her credibility because the claimant drove a school bus part time, failed to see her doctors consistently, and had no difficulty sitting during a forty-five minute hearing). The ALJ's task is not to determine whether a claimant has fibromyalgia, but is "to evaluate her claimed symptoms (e.g., extent of pain and movement limitations) in light of the medical evidence and her testimony in order to determine how disabling that condition actually is." *Id*. ("Obviously, if a claimant says she has crippling fibromyalgia but runs a marathon twice a week, the ALJ need not turn a blind eye to the objective facts.").

[5] Because a remand is warranted based on the ALJ's credibility determination, a discussion of Fettinger's other arguments is unnecessary.

## V.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this Opinion.  The Clerk is directed to enter a judgment in favor of Fettinger and against the Commissioner.

SO ORDERED.

Enter for this 31st day of July, 2012.

S/Roger B. Cosbey  
Roger B. Cosbey,  
United States Magistrate Judge